# In the United States Court of Federal Claims

Case No. 11-405C

**REDACTED VERSION** Filed:  October 25, 2011

*(This Redacted Opinion includes all the redactions requested by the parties in their Joint Statement on Redactions filed October 21, 2011.)*

```
************************************************  *
                                                 *    Bid protest; TRICARE
UNITED HEALTH MILITARY                           *    Management Activity;
VETERANS SERVICES, LLC,                          *    enhancement to a proposal;
            Plaintiff,                           *    acknowledgment and
                                                 *    discussion of risks; price
v.                                               *    realism; best value
                                                 *    determination; guaranteed
THE UNITED STATES OF AMERICA,                    *    network discounts; referral
            Defendant,                           *    management procedure;
                                                 *    subcontractor pricing;
and                                              *    underwriting fees
                                                 *
HUMANA MILITARY HEALTHCARE                       *
SERVICES, INC.,                                  *
            Intervenor.                          *
************************************************
```

**Thomas C. Papson**, McKenna Long & Aldridge LLP, Washington, D.C., Counsel of Record for Plaintiff.

**Arlene P. Groner**, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., Counsel of Record for Defendant.

**Peter L. Wellington,** Steptoe & Johnson, L.L.P., Washington, D.C., Counsel of Record for Intervenor.

**Amelia Moorstein**, law clerk.

# OPINION

**BASKIR**, Judge.

## I. INTRODUCTION

This bid protest comes before the Court on Cross-Motions for Judgment on the Administrative Record.  TRICARE Management Activity (TMA) solicited bids for the South Region to provide managed care support services to complement the military health care system.  Plaintiff, United Health Military & Veterans Services, LLC (UMVS or Plaintiff) and Intervenor, Humana Military Health Care Services, Inc. (HMHS or Intervenor) bid for the contract, and TMA ultimately awarded the contract to HMHS.

UMVS asserts that TMA made its award despite the fact that HMHS's proposal was noncompliant with the material terms of the solicitation and that TMA failed to recognize the substantial risk associated with HMHS's proposal.  UMVS argues that TMA should have either rejected HMHS's proposal or substantially lowered its rating of HMHS under the technical approach factor to give UMVS a substantial chance for award.

Because we find that HMHS complied with the terms of the solicitation and TMA rationally evaluated HMHS's proposal to arrive at its award decision, **we DENY Plaintiff's Motion for Judgment on the Administrative Record and GRANT Defendant's Motion for Judgment on the Administrative Record.**

## II. BACKGROUND

### A. Procedural History

The following facts are taken from the parties' filings.  TMA published the solicitation at issue on March 24, 2008.  On July 17, 2009, TMA awarded the contract to Plaintiff.  The version of the solicitation on which that award was made was Request for Proposal (RFP) Amendment 7, which contained the last comprehensive version of the RFP and conformed to all prior amendments.

HMHS protested the award to Plaintiff at the General Accountability Office (GAO), and GAO sustained the protest on one ground -- that TMA's technical evaluation and best value analysis failed to take into account the potential benefits of network provider discounts.

On May 5, 2010, TMA announced its intended approach to corrective action in an RFP Amendment 8. TMA amended the solicitation five more times and issued the final corrective action amendment, RFP Amendment 13, on October 22, 2010. UMVS and HMHS submitted their final revised proposals on November 9, 2010. On February 25, 2011, TMA announced its decision to award the contract to HMHS. UMVS filed its GAO protest on March 7, 2011, and the GAO issued its decision on June 14, 2011. Plaintiff filed its Complaint in this Court on June 21, 2011, after its protest was denied at the GAO. HMHS began transition activities under the new T-3 contract when the decision was issued. The United States and HMHS have agreed not to rely on contract performance in opposing the award of injunctive relief.

## B. Factual Background

### i.    The Solicitation

TMA is a managed healthcare program for active-duty and retired members of the uniformed services and their dependents and survivors. The program combines government-operated Military Treatment Facilities (MTFs) with networks of civilian providers established and maintained by Managed Care Support (MCS) contractors who provide health, medical, and administrative support to eligible beneficiaries.

There have been three competitive procurements of MCS contracts in the TRICARE program, known as T-1, T-2, and T-3. The T-3 procurement is the subject of this action. The T-3 contracts involve three continental United States TRICARE regions -- North, South, and West -- with one MCS contractor responsible for each region. This action concerns the South Region contract. The T-3 performance periods are comprised of a 10-month base period for transition and five, one-year option periods for the delivery of healthcare services.

The solicitation provided that awardees under the T-3 contract would provide a range of services to support the direct care system of MTFs in

the implementation of the TRICARE healthcare program, including establishing and managing a network of individual and institutional healthcare providers, managing referrals for specialty care, operating a medical management program, enrolling beneficiaries, processing claims, and providing customer service to Military Health System beneficiaries.

The RFP stated that TMA would evaluate the proposals based on three factors: Technical Approach, Past Performance, and Price/Cost, in that order of importance.  The non-price evaluation factors combined were "significantly more important than price."  AR Tab 107 at 8673.  Under the Technical Approach factor, there were seven subfactors that were weighted equally:  Network Development and Maintenance, Referral Management, Medical Management, Enrollment, Beneficiary Satisfaction/Customer Service, Claims Processing, and Management Functions.  Each technical approach subfactor received an individual merit rating and a proposal risk rating.

The Network Development and Maintenance subfactor, implicated in this protest, would be evaluated according to various criteria, such as "[t]he offeror's approach to network sizing, including the number of providers, types of providers, [and] access to specialty providers" and their methods for developing a network that complied with mandated "access standards" in the Prime Service Areas.  *Id.*  The Referral Management subfactor would be evaluated according to various criteria, such as █████████████████ █████████████████

The Referral Management section of the RFP also stated, "[t]he offeror shall describe how it will meet the requirements for processing referrals in accordance with the TOM Chapter 8, Section 5."  *Id.* at 8663. TOM Chapter 8, Section 5 outlined the following procedure, which Plaintiff argues is mandatory:





UMVS Mem. Ex. 1.

All technical proposals could include "enhancements"- elements of an offer that exceeded the Government's minimum requirements, including performance standards that exceeded the minimum standard or additionally offered performance standards. These enhancements were to be included in the proposal in a separate list and the offeror was required to explain the element offered and why it was beneficial to the Government.

For the Price/Cost Factor, TMA supplied the estimates of healthcare costs to be underwritten and required the offerors to use those estimates in their proposals. TMA also provided maximum underwriting fee amounts for each period, and included in the RFP separate Contract Line Item Numbers (CLINs) for each option period for underwritten healthcare costs and provided that those costs would be paid on a cost plus fixed fee basis. Offerors were not permitted to propose healthcare costs, but rather were instructed to use government-supplied estimates of underwritten healthcare costs for each of the two beneficiary populations (contractor network prime enrollees, and non-prime enrollees and Military Treatment Facilities enrolled prime enrollees). The offerors were also required to propose a fixed dollar amount of healthcare fixed fees (also referred to as underwriting fees) for each of the two beneficiary groups for each option period. The Price/Cost proposal would be evaluated by a cost realism analysis "in accordance with FAR 15.404-1(d)." AR Tab 107 at 8677.

ii.    Final Proposal Revision 1 Evaluation- Initial Award

HMHS, UMVS, and a third offeror bid on the original solicitation. HMHS, a subsidiary of Humana, is a longstanding TRICARE incumbent and is currently performing the T-2 MCS contract for the South Region. That contract's performance extends through March 31, 2012. Performance under the new T-3 contract is supposed to start immediately thereafter. UMVS, a wholly owned subsidiary of UnitedHealth Group, has not previously performed an MCS contract.

The evaluation of final proposal revisions (FPRs) was completed by the Source Selection Evaluation Board (SSEB), which was comprised of the Technical Evaluation Team (TET), the Performance Assessment Group (PAG), and the Price/Cost Team (P/CT). These teams prepared reports for review by the SSEB. The evaluations were then summarized in the SSEB Chair Report. The SSEB Chair also conducted a comparative assessment and provided a best value recommendation. The Source Selection Authority (SSA) made a final best value decision based on all of the described documents.

The SSA determined that the proposals of both UMVS and HMHS were superior to that of the third offeror and selected UMVS for award. Both HMHS and UMVS were rated Blue (Exceptional) on each of the seven subfactors under Technical Approach and each was rated High Confidence on the Past Performance factor. Under the Technical Approach, HMHS received seven "Low" proposal risk ratings and had a greater number of strengths. UMVS had six "Low" proposal risk ratings, and one "moderate" proposal risk rating under the Claims Processing subfactor. HMHS received a strength under the Referral Management subfactor for an unchallenged enhancement proposal related to ███████████████████ ████████████.

UMVS's evaluated price after excluding the government-supplied estimates for underwritten healthcare and disease management was $1.339 billion. This price included ███████████ in underwriting fees and ███████████ in Administrative Services prices. HMHS's evaluated price after those same exclusions was ███████████. This price included ███████████ in underwriting fees and ███████████ in Administrative Services prices. Because UMVS was "essentially equal" to HMHS on the two non-price factors (Technical Approach and Past Performance) and

nothing in HMHS's proposal "would be worth the ███████████ price difference between the proposals," TMA determined that UMVS was the best value.  AR Tab 79 at 3784.

HMHS protested the award to UMVS at GAO.  GAO upheld HMHS's protest of TMA's award to UMVS of the T-3 South Region contract on the grounds that TMA's technical evaluation and best value analysis failed to "acknowledge the significant potential cost benefit from Humana's record" of obtaining network discounts and "factor [in]…the extent of the likely significant healthcare cost saving to the government" as part of one of HMHS's strengths.  AR Tab 181 at 17157-58.

    iii.    The Final Proposal Revision 3 Evaluation- Pending Award

On May 5, 2010, TMA announced its intended approach to corrective action in an RFP Amendment 8.  TMA amended the solicitation five more times.  TMA issued RFP Amendment 13, the final corrective action amendment, on October 22, 2010.  For FPR 3, only the TET and P/CT prepared evaluations.  These findings were summarized in an SSEB Chair Report.  The SSA reviewed these documents and made the final award decision.

RFP Amendment 8 announced that TMA would consider network provider discounts as a technical strength, but only if they were guaranteed and met certain other requirements.  Offerors could revise their proposals to add such a guarantee.  TMA later clarified that offerors could make no other changes to their technical proposals.  Amendment 13 set forth a format and instructions for proposing the guaranteed discounts.  The solicitation also directed the offerors to explain the risks associated with their guarantees.

TMA also updated the period of performance by shifting the contract performance period two years into the future so that Amendment 13 set forth for the five-year period of healthcare delivery higher estimates of underwritten healthcare costs, greater estimated volumes of electronic claims and Per Member Per Month (PMPM) member months, and lower estimated volumes of paper claims.

The revised solicitation permitted offerors to revise their previously offered prices.  Any changes to price could not be based on changes to

technical approach, since offerors were only permitted to change their guaranteed discounts in the Technical Approach section.  If any guaranteed discounts impacted the offeror's pricing strategy, the impact was to be specifically identified and only be reflected in a revision to the underwriting fee.  Paragraph C.3 of Amendment 13 provided that any changes to price were to be summarized in the FPR and supported by spreadsheets.  This section also provided that any changes to unit prices or new estimating assumptions/methodologies were to be fully described.

In response to the amended RFP, UMVS and HMHS submitted revised proposals, the FPRs 2.  TMA then conducted discussions with the offerors and gave them an opportunity to submit further revised proposals, the FPRs 3, which they submitted on November 9, 2010.  Both companies submitted guaranteed network discount proposals.  TMA assigned an expected monetary value to HMHS's guaranteed percentage discount of approximately ▮▮▮▮▮▮▮▮▮ and assigned an expected monetary value to UMVS's guaranteed percentage discount of ▮▮▮▮▮▮▮▮▮.

The SSA concluded, "Proposal risk for HMHS is 'low' for all subfactors while UMVS has six 'low' proposal ratings and one 'moderate' rating, for subfactor 6, Claims Processing."  AR Tab 3 at 445.  Both offerors received "low" proposal risk ratings for the Network Development and Maintenance Subfactor, which is the subfactor under which their proposed guaranteed discounts were evaluated.  TMA found that each offeror's proposed guaranteed discounts merited an additional strength under the Network Development and Maintenance Subfactor, and that HMHS's much larger guaranteed discount gave HMHS a "slight advantage" in the technical evaluation.  *Id.* at 443.

Under the new proposals, HMHS proposed underwriting fees of ▮▮▮▮▮▮▮▮▮ and UMVS proposed underwriting fees of ▮▮▮▮▮▮▮▮▮. HMHS proposed a total Administrative Services price of ▮▮▮▮▮▮▮▮▮ and UMVS proposed a total Administrative Services Price of ▮▮▮▮▮▮▮▮▮.  The P/CT concluded that both offerors' Total Evaluated Prices were reasonable and that HMHS's total evaluated price was ▮▮▮▮▮▮▮▮▮ lower than UMVS's.  Though the SSA found a slight performance risk related to HMHS's reduced underwriting fee and subcontractor Palmetto Government Benefits Administrator (PGBA)'s reduced ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, he found, "[t]he performance risk in HMHS's proposal is outweighed by HMHS's slightly

superior technical approach and lower overall price." *Id.* at 449.  On February 25, 2011, TMA announced the award to HMHS.

### C.  Plaintiff's Claims

Plaintiff's claims relate to three aspects of the contract: the referral management procedure, network provider discounts, and pricing for administrative services by HMHS's subcontractor, PGBA.

First, Plaintiff argues that HMHS violated a term of the solicitation by proposing a referral management procedure -- ███████████████ ██████████ -- that did not adhere to the process set forth in the TOM Chapter 8, Section 5, Paragraph ████.  According to Plaintiff, this provision should be strictly construed as placing a requirement on the contractor to process claims ███████████████████████████████ ; HMHS's proposal to █████████████████████████████████ ██████████████.  This procedure was part of HMHS's original proposal and had been characterized by TMA as an "enhancement."



Second, Plaintiff argues that HMHS violated a term of the solicitation by failing to acknowledge and discuss the risks associated with its network provider discount guarantees as required by Amendment 13.  Plaintiff also argues that TMA irrationally concluded that HMHS's proposed network provider discount guarantees posed minimal performance risk given the value of its guarantee and proposed underwriting fee.

Finally, Plaintiff argues that HMHS violated a term of the solicitation because it did not explain the basis for the subcontractor's price cuts from FPR 1 to FPR 3 as required by Amendment 13.  Plaintiff also argues that TMA irrationally assessed the performance risk created by the subcontractor's proposal to reduce ███████████████████████ and perform the subcontract ██████.

## III.  DISCUSSION

### A.  Legal Standard

For Motions for Judgment on the Administrative Record pursuant to Rule of the U.S. Court of Federal Claims (RCFC) 52.1, the Court resolves fact questions by reference to the administrative record as it existed before

the agency. *Bannum, Inc. v. United States,* 404 F.3d 1346, 1354-56 (Fed. Cir. 2005).

The Court reviews procurement determinations under the standard set by 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4). The Court may only "set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am. v. United States,* 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (quoting *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057-68 (Fed. Cir. 2000) (quoting 5 U.S.C. § 706(2)(A))).

An agency's decision is arbitrary and capricious if the agency (1) "relied on factors which Congress has not intended it to consider," (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision that runs counter to the evidence before the agency," or (4) the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Adv. Sys. Dev., Inc. v. United States,* 72 Fed. Cl. 25, 30 (2006) (quoting *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). Conversely, the Court should deny a protest if the agency "provided a coherent and reasonable explanation of its exercise of discretion," *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332-33 (Fed. Cir. 2001) (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy,* 19 F.3d 1342, 1356 (11th Cir. 1994)), and articulated a "rational connection between the facts found and the choice made." *Motor Vehicles Mfrs. Ass'n,* 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)). The Court should not "sit as a super source selection authority to second guess agency procurement decisions" and "should not substitute its judgment to assess the relative merits of competing proposals[.]" *Ceres Envtl. Servs., Inc. v. United States,* 97 Fed. Cl. 277, 308 (2011).

To assess performance risk under the network provider discount and administrative services factors, the agency conducted a price realism analysis. AR Tab 107 at 8677. Price realism analysis is "a verification that the offeror's price is not overly optimistic and impractically low," *DMS All-Star Joint Venture v. United States,* 90 Fed. Cl. 653, 663 (2010), and is "conducted to avoid poor performance due to underbidding." *Afghan Am. Army Servs. Corp. v. United States,* 90 Fed. Cl. 341, 359 (2009). To be rational, the price realism analysis "must show that the agency took into

account the information available and did not make irrational assumptions or critical miscalculations." *Fulcra Worldwide, LLC v. United States,* 97 Fed. Cl. 523, 539 (2011).

Because this procurement was a best value determination, the agency is entrusted with "especially great discretion, extending even to his application of procurement regulations." *PlanetSpace Inc. v. United States*, 96 Fed. Cl. 119, 125 (2010) (quoting *Am. Tel. & Tel. Co. v. United States,* 307 F.3d 1374. 1379 (Fed. Cir. 2002)). In a best value determination, the agency's contract award is least vulnerable to challenge, *PlanetSpace Inc. v. United States*, 96 Fed. Cl. at 125, and a court's review must be highly deferential. *Northeast Military Sales, Inc. v. United States,* 2011 WL 2307660, *6 (May 31, 2011).

B. <u>Referral Management</u>

Plaintiff waived the opportunity to challenge HMHS's referral management proposal because it failed to ask TMA for clarification on this solicitation term before final bids were submitted and implicitly endorsed TMA's interpretation of this term during the first GAO protest. Furthermore, we agree that HMHS's referral management proposal was properly characterized as an enhancement pursuant to the solicitation terms.

Plaintiff claims HMHS violated a term of the solicitation by proposing a referral management procedure that differed from the procedure set forth in the TOM Ch. 8, §5. HMHS's proposal states,



AR Tab 110.2 at 9047.

In the first round of bidding, HMHS received a strength for this proposal under the Referral Management subfactor. AR Tab 88.2 at 4507. In its Comments on the Agency Report during the first GAO protest, UMVS stated, "TMA conducted a thorough assessment of each technical subfactor for both merit and risk." AR Tab 186 at 17330. In its Post-Hearing Comments, UMVS specifically discussed how HMHS's Referral Management subfactor was identified as a strength by both the SSEB Report and the SSA, though the SSA ultimately concluded that this subfactor did not merit the significance that the SSEB Report placed on it. AR Tab 188 at 17464-5. UMVS described the SSA's analysis as "straightforward and reasonable." *Id.* at 17465.

The first GAO decision also discussed HMHS's ███████ proposal:



Humana's proposal received a strength under the Referral Management subfactor on the basis that it proposed a plan to

AR Tab 181 at 17150.

Thus, when UMVS was preparing its FPRs 2 and 3 pursuant to the post-protest Amendments, it was well aware that TMA interpreted the solicitation term pertaining to referral management as permitting offerors to propose ███████████████. Yet UMVS never objected to this term. UMVS even agreed with TMA's evaluation of the referral management subfactor in its filings during the first GAO protest.

In *Blue & Gold Fleet, L.P. v. United States,* 492 F.3d 1308, 1313 (Fed. Cir. 2007), the Court held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid action protest in the Court of Federal Claims." The Court explained that its holding was based on the same rationale as the patent ambiguity doctrine:

> [This doctrine] was established to prevent contractors from taking advantage of the government, protect other bidders by assuring that all bidders bid on the same specifications, and materially aid the administration of government contracts by requiring that ambiguities be raised before the contract is bid, thus avoiding costly litigation after the fact.

*Id.* at 1314 (quoting *Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1580 (Fed. Cir. 1993)). The Court also explained that it would be unfair to allow bidders to "sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm." *Id.* (quoting *Argencord Mach. & Equip., Inc. v. United States*, 68 Fed. Cl. 167, 175 n. 14 (2005)).

Once UMVS learned that TMA interpreted the referral management subfactor as allowing HMHS's follow-up procedure, it could have objected to this term if it disagreed or found the term ambiguous; this objection would have resulted in TMA clarifying what exactly was required and allowed as part of this subfactor. Allowing UMVS to object to this term post-award would contradict the purposes of the *Blue & Gold* rule.

Not only did UMVS fail to ask for clarification, but also it agreed with TMA's interpretation of the referral management subfactor. The Supreme Court has held that when a party "assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." *Zedner v. United States*, 547 U.S. 489, 504 (2006). This doctrine of judicial estoppel applies when a party takes a position before an administrative agency and later contradicts that position in front of a court. *Tr. in Bankr. Of North Am. Rubber Thread Co., Inc. v. United States*, 593 F.3d 1346, 1354 (Fed. Cir. 2010). UMVS endorsed TMA's evaluation of all technical factors, including the referral management subfactor, in the first GAO protest. It is estopped from now disagreeing with this same evaluation just because its interests have since changed.

Moreover, we agree with the Government that HMHS's proposal was an enhancement to the minimum requirements of the solicitation and do not read TOM Chapter 8, § 5, ▮▮▮▮ as setting forth a mandatory ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. HMHS's proposal ensures that the contractor

has a greater chance of utilizing the less expensive healthcare option and saves the government more money than the procedure set forth in the TOM.   Furthermore, HMHS's proposed procedure does not interfere with the expeditious processing of referrals, as HMHS specifically stated in its RFP that it would "meet the T-3 referral processing standard that at least 90% of referral requests be processed within two business days following the date of receipt [and]…will also meet the 100% standard for processing of all requests within three business days."  AR Tab 110.2 at 9042.

   C. <u>Network Provider Discounts</u>

   i.   Term Violation

   HMHS adhered to the terms of the solicitation in discussing the risks associated with its guaranteed network provider discounts.  Amendment 13 required,

> …an acknowledgement and discussion of the risks assumed by the offeror for the guaranteed network provider discounts, given that the Outpatient Prospective Payment System (OPPS) was implemented by TRICARE in May 2009 and reduced reimbursement levels to hospitals and that TRICARE reimbursement rates are generally tied to Medicare rates by law and Medicare rates may be highly uncertain during the option periods of the awarded contract.

AR Tab 10 at 577.

   UMVS asserts that HMHS violated this term because it failed to recognize and address the risk that Medicare rates may be cut through some mechanism other than the Sustainable Growth Rate (SGR).

   Amendment 13 did not dictate how the bidders were required to evaluate the risk, but merely required that they somehow address the risk. It also did not require them to assume that Medicare rates would be highly uncertain, but asked them to acknowledge that rates *may* be uncertain. HMHS satisfied the "acknowledgement and discussion" requirement.  In its RFP 3 under a section entitled "Acknowledgment and Discussion of Risks," which we quote at length, HMHS stated,

We acknowledge that there are a variety of risk factors that could affect our ability to achieve the anticipated discounts, including changes in TRICARE reimbursement policy and inflationary pressures. ████████████████████



We have encountered similar situations where we managed our provider network within the context of major and complex changes to TRICARE reimbursement rates.  The most relevant and recent example is the implementation of OPPS, which put tremendous pressure on reimbursement rates. ████████████

Our risk analysis justified a ██████ underwriting fee for the risks defined in FPR1 and ██████ underwriting fee in FPR3 due to the additional risk of the discount guarantees. ████████████

In 2009, Humana Inc. had approximately $30 billion in premium revenue, net income of $1 billion, and risk capital (stockholder equity) of approximately $6 billion. ████████████████

Our complete risk analysis is more fully described in Appendix A.

AR 22.2 at 898-99; AR Tab 22.1 at 821.

The excerpt cited above is an acknowledgement and discussion of reimbursement rate risks. This discussion is further supplemented by the Appendix. The content and extent of the discussion was to be determined by the bidder. The sufficiency of the bidder's discussion is a separate issue; the agency took into account the sufficiency of the content in making its award decision, and we defer to the agency's decision unless we find it to be arbitrary and capricious. This issue is discussed below.

ii. Irrational Review

The record does not show that TMA's evaluation of the purported "risks" posed by HMHS's network provider discount was arbitrary, capricious, or irrational. Plaintiff contends that TMA failed to recognize and consider the "substantial" proposal and performance risk allegedly caused by HMHS's failure to account for Medicare rate reduction. Plaintiff argues that HMHS proposed an unrealistic guarantee and a minimal underwriting fee as a result of its insufficient risk analysis; it alleges that TMA erred by ultimately assigning HMHS a low proposal risk and a slight performance risk, and by accepting HMHA's guarantee and underwriting proposals.

a. Proposal Risk

The TET reviewed the following information to assess HMHS's proposal risk for its proposed guaranteed discounts:

- HMHS's build-up of proposed discounts. AR Tab 22.1 at 852-84.
- How HMHS's current network strategy would help achieve guaranteed discount levels for the new contract, including: the stability of its network due to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮; the minimizing of administrative requirements for network providers; its high administrative quality and service to providers; and its active management of the network. *Id.* at 812-13.
- HMHS's explanation of factors it considered in proposing discounts, including: the allowable charges for various categories of care penetration rates (i.e. percent of care in the network) both in prime service areas and outside; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 814-20, 852-56.

- Post-OPPS average discount rates as a starting point to fully incorporate the effect of reimbursement change into its discount. *Id.* at 827.
- Adjustments for future contingencies. *Id.* at 827- 31.
- A report drafted by Kennell and Associates, a technical consultant hired to analyze the provider discount proposals. Def.'s Mem. at 123-5.

The TET articulated its reasoning and decision in the following ways:

- "This is a reasonable approach for HMHS to take considering the current political climate regarding the pending cuts and the Congressional history…Accordingly, it is not unreasonable for Humana to ███████████████████████ proposed discounts." AR Tab 7 at 476-77.
- "These [reimbursement level] adjustments are appropriate and are an effective method to mitigate the risk involved in guaranteeing network discounts because they identify areas where potential future events and/or certainties may impact their ability to obtain discount rates at their current experience level." *Id.* at 479.
- "[HMHS's] methods will likely be effective because a large, diverse network provides flexibility and options for directing network care, and provides some assurance that discount guarantees will be achieved because of the large number of available providers, ███████████ ███████████████ *Id.* at 480.
- "A stable network, with providers whose ████████████████████ ████████████████████████████████████████████████ *Id.*
- "[The referral process] guards against HMHS basing referral decisions strictly on cost implications and is particularly relevant if they are having problems achieving ████████████ guarantee." *Id.*
- "HMHS has structured their guarantees based on current experience with reasonable adjustments for future events that may impact their ability to obtain discounts. This structuring, along with their previously evaluated and acceptable technical approach provides assurance that they will be able to successfully perform contract requirements without any adverse impact due to discount guarantees." *Id.*

These findings by the TET were ultimately adopted by the SSEB and SSA. The SSA concluded,

> I do note that the RFP requested offerors to acknowledge and discuss the risks assumed by the offerors for any guaranteed network provider discounts offered. Specific reference was made to the fact that TRICARE reimbursement rates are generally tied to Medicare law…Both offerors addressed this issue…I do not believe that HMHS's position on this issue increases the risk associated with their proposal in any meaningful way.

AR Tab 3 at 444-45.

The RFP 3, Technical Evaluation Report for Amendment 13, and Source Selection Decision Document show that TMA's decision to award the contract to HMHS was informed and reasonably tied to the facts presented. TMA was provided specific information on how HMHS intended to achieve its proposed discounts, and TMA reasonably articulated how this information factored into its award decision. TMA's well-articulated discussion shows that it considered many aspects of HMHS's proposal to arrive at a reasonable decision that HMHS could achieve its proposed discounts.

### b. Performance Risk

HMHS provided an extensive analysis of the risk it was undertaking. Its analysis included the risk both for conditions pre-Amendment 13 and the additional risk it assumed in its Amendment 13 proposal. HMHS set forth ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ in its FPR 3 and concluded that its proposed underwriting fee would be sufficient ▇▇▇▇▇▇▇▇▇. In the case of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

HMHS provided the following information regarding their underwriting fees:
- Discussions regarding the reduced underwriting fee from FPR 1 to FPR 3. AR Tab 27 at 2837-38; AR Tab 22.3 at 975-76.

- Analysis of the underwriting risks presented through Amendment 7 (pre-corrective action). *Id.* at 978- 80.
- Analysis of underwriting risks associated with discounts proposed pursuant to Amendment 13. *Id.* at 980- 85.
- Statement that, though HMHS ███████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████. In 2009 Humana Inc. had $30 billion in premium revenue, net income of $1 billion and risk capital (stockholder equity) of about $6 billion." *Id.* at 985.

In examining the underwriting fees, the P/CT articulated the following considerations and conclusions:

- "HMHS provided supporting detail in FPR 3 explaining the bases and assumptions on which it developed its HCFFs [Health Care Fixed Fees]. HMHS recognized the risk associated with offering guaranteed discounts and how that risk was factored into the proposed HCFF." AR Tab 9 at 539.
- "HMHS expressed that its proposed HCFF in FPR 1 was higher ████ ███████████████████████████████████████████ ███████████████████████████████████ *Id.*
- "HMHS gave a thorough explanation of its consideration of each element of risk, including the risk of overpayment for unallowable health care cost." *Id.* at 540.
- "The P/CT believes HMHS ██████████████████████████ ████████████ *Id.*
- "…[C]ontractors can earn a positive award fee based on good performance in other areas which further mitigates a risk of loss on the contract." *Id.*
- "…[I]t appears HMHS is assuming a comparatively higher degree of risk of delivering health care at a net loss." *Id.*
- "HMHS also proposed a very aggressive HCFF. HMHS is the incumbent contractor and therefore understands the risk that it is assuming." *Id.* at 550.

The SSA adopted most of the P/CT and SSEB Chair report and articulated its decision in the following ways:

- "While P/CT expressed some concern regarding HMHS's proposed Health Care Fixed Fee, HMHS did present its own assessments and it is clear that HMHS understands the risk of its proposed network provider discount guarantee." AR Tab 3 at 448.
- "I recognize there is slight risk associated with the amount of HMHS's Health Care Fixed Fee, however, I also note that there are other sources of revenue available to the contractor, such as Award Fees, should the network provider discount guarantee not be achieved." *Id.*
- "I also note in the FPR 3 TET report that it is likely that HMHS will meet their proposed network provider discount guarantee and I agree with the SSEB Chair that this will mitigate the risk." *Id.*
- "I attribute the low Health Care Fixed Fee offered by HMHS to their being very aggressive in a very competitive environment in an effort to keep the TRICARE South Region contract. *Id.*
- "HMHS has been the South Region contractor for seven years, has a mature provider network where they have been receiving network provider discounts which I believe will continue and they fully understand the risk they are accepting by proposing a low Health Care Fixed Fee." *Id.* at 448- 49.
- "As discussed above, I considered the reasons provided by the P/CT and the SSEB Chair as to why performance risk was identified. I find that these slight risks are mitigated by…HMHS's extensive TRICARE experience and by the corporate guarantee provided by Humana, Inc…" *Id.* at 449.

TMA is the expert on analyzing HMHS's data and proposal information. The information provided by HMHS and the agency's reports show that, while there was some risk involved in HMHS's low underwriting fee, the agency came to an informed decision that it was ultimately in its best interest to accept HMHS's proposal. We defer to the agency's decision.

D. Subcontractor Pricing

    i. Term Violation

UMVS alleges that PGBA violated the solicitation requirements by failing to explain its reduced price for ██████████████████ from

FPR 1 to FPR 3, especially in light of the government's increased
██████████████ estimate.  UMVS specifically takes issue with HMHS's
changed ████████████████ which refers to the ████████████████
████████████████████████.  The record shows that
HMHS included information in its proposal to explain its new estimating
assumptions and the difference in subcontractor pricing between FPR 1
and FPR 3, thus satisfying the solicitation requirements.

Amendment 13 required,

> Any revision to offered prices in Section B shall include a
> written summary of changes and supporting cost summary
> spreadsheets that clearly display the changes including the
> difference between the FPR and the prior January 2009 FPR.
> If the offeror revises unit prices, or introduces new estimating
> assumption/methodologies, it shall be fully described consistent
> with instructions under [RFP Section] L.8.

AR Tab 10 at 575.

In its Price/Cost Report, HMHS submitted PGBA's subcontractor
proposal which included 30 pages explaining the changes in price from
FPR 1 to FPR 3.  *See* AR Tab 22.3 at 1448-78.  Within these 30 pages,
PGBA discusses:

- How it arrived at its reduced price ████████████████████████.
  This discussion included ████████████████ relating to its
  proposed ████████████████████████.  *Id.* at 1450-52.
- Information on its ████████████████████████████████
  ████.  *Id.* at 1452.
- Reasons for present and continued ████████████████████████
  ████.  *Id.* at 1451.
- Changes in "Cost Estimating Factors" from FPR 1 to FPR 3, such as
  ████████████████████████████████████████████.  *Id.* at
  1453-56.

With regard to its changed ████████████████, PGBA explained,

> PGBA continues to reap the rewards of ████████████████
> ████████████████████████████████████████
> ████████████████████████████████████████



...

As documented in FPR 1 and Section IV.C. 'Each year PGBA makes additional investments to improve CMMS [Claims Medical Management System]. For example, ███████████ ████████████████████████████████████████████████ ██████████████████████████████████████████. These ongoing investments in continuous improvement have resulted in increases in the █████████████████████ . The FPR 3 ████████ reflect current experience for OP 7 with ██████████████████

*Id.* at 1451.

PGBA's explanation of its reduced ██████████████████ price satisfies the requirement set forth in Amendment 13. It displayed the difference in price between the two proposals, and explained how it arrived at this changed price. The *adequacy* of PGBA's explanation of its price changes is a separate issue that is discussed below.

ii.    Irrational Review

TMA rationally reviewed HMHS's proposed administrative prices for PGBA's services. The agency specifically addressed the risk being assumed by PGBA, and ultimately decided that PGBA could reasonably bear the risk. The record shows that the agency's consideration of this issue was fully informed and rational.

HMHS's decrease in overall administrative prices from FRP 1 to FPR 3 was a result of reduced ██████████████████ , changes in estimated ████████████████████ , reduction in ████████ █████████████████████████████████████████████████████ from the time FPR 1 was submitted, and reduced subcontractor prices. *See* AR Tab 9 at 531, 533- 37, 549, 561- 63. PGBA lowered prices

because it reduced ████████████████████████████████
████████████████████████.

    HMHS submitted PGBA's proposal that contained the information discussed in the previous section. PGBA additionally stated, "In terms of financial risk, PGBA is backed by ███████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████ AR Tab 22.3 at 1458.

    The P/CT Report shows that it examined HMHS's basis for lowering its administrative prices. It expressed some doubt as to PGBA's ability to achieve the proposed price reductions without posing a risk to its performance. *See* AR Tab 9 at 548-50. Specifically, the P/CT noted:

- "PGBA is an experienced claims processing contractor on the TRICARE program with nearly 30 years of experience to CHAMPUS and TRICARE. Therefore, PGBA clearly understands the requirements of the T-3 contract. However, it appears that PGBA has been aggressive with its proposed price and ████████ ████████ *Id.* at 550.
- "The P/CT requested assistance from the T-3 TET since the P/CT has uncertainties as to whether the proposed efficiencies and resulting ████ reduction in ██████████████ could be achieved by PGBA without a performance risk. The T-3 TET performed an analysis…and concluded that PGBA's reduction in ██████████ from FPR1 to FPR3 is reasonable." *Id.*
- "Although the TET concluded that the reduction in ██████████ is reasonable, the P/CT still has some uncertainty as to whether PGBA can achieve its goal for projected ████████ throughout the T-3 contract." *Id.* at 550-51.

    The SSA considered the P/CT Report and articulated the reasoning behind his conclusion that, despite some of the risk involved in PGBA's proposal, he believed PGBA would reasonably be able to perform the contract. *See* AR Tab 3 at 446-47. Some highlights of his discussion are set forth below:

- "I do concur that there is some risk associated with HMHS's lowered administrative prices, and I fully considered this risk in my tradeoff analysis. The P/CT identified the performance risk concerns regarding the lower prices of HMHS's subcontractor, PGBA." *Id.* at 446.
- "With respect to PGBA's ██████████████, the P/CT concern was based on the fact, in FPR3, that HMHS did not include a demonstration of PGBA's financial wherewithal. I do not concur with this concern. PGBA's subcontractor proposal explains not only the rationale for the █████████████, but also the financial ability of PGBA ████████████████████████████████████████████████ *Id.*
- "With regard to ████████████████████, I do concur that there is some risk created by PGBA's reduction in ████████████████ however, there are also factors that mitigate these concerns...I find that PGBA's estimate of ████████████████████ is adequately explained in its proposal and is based on trends it indicates it is currently accomplishing." *Id.* at 446- 47.
- "...I agree that HMHS's proposal has some performance risk with respect to its reduction in ████████████████████ ████...[T]his is mitigated by the corporate guarantee of Humana, Inc., the fact that PGBA has been successfully processing TRICARE claims over the past six years and that their past performance in processing claims has been generally exceptional." *Id.* at 447.

Though the lower-level reports expressed some doubt as to the reduced administrative prices, the SSA discussed these risks and gave a reasonable explanation as to why he thought the proposed prices warranted only a slight performance risk.

## IV. CONCLUSION

Had the Court agreed with any of Plaintiff's allegations of evaluation error, Plaintiff would have been prejudiced because it would have had a substantial chance of receiving the contract award but for these errors. *210 Earll, L.L.C. v. United States*, 77 Fed. Cl. 710, 718 (2006). The alleged

errors would have affected the outcome of TMA's technical, risk, or pricing evaluations and likely impacted the overall best value decision.

However, Plaintiff has failed to show that HMHS violated any terms of the solicitation or that TMA's award decision did not have a rational basis. HMHS adhered to the terms of the solicitation and provided ample information in proposing its referral management procedure, guaranteed network provider discounts, and administrative services pricing.  TMA thoroughly reviewed the information provided in HMHS's proposal, discussed the advantages and disadvantages it saw in the proposal, and articulated its reasoning in arriving at its award decision.  Though we have only given some examples of the evaluation process that support our conclusions, we agree with the other arguments presented in Defendant's briefs that similarly demonstrate that HMHS's proposal conformed to the terms of the solicitation and that TMA's review of HMHS's proposal was rational.

For these reasons, **we DENY Plaintiff's Motion for Judgment on the Administrative Record and GRANT Defendant's and Intervenor's Motions for Judgment on the Administrative Record.  The Clerk's office is ordered to enter judgment in favor of the Defendant and Intervenor.  Parties are to bear their own costs.**

**IT IS SO ORDERED.**

s/ Lawrence M. Baskir
LAWRENCE M. BASKIR
Judge